# IN THE SUPREME COURT OF IOWA

No. 14–0411

Filed May 8, 2015

Amended July 14, 2015

**JOSEPH H. SANFORD** and **SUZANNA L. SANFORD,**

Appellants,

vs.

**LYNN FILLENWARTH** and **JULIE FILLENWARTH,** as Executors of the Estate of KENNETH FILLENWARTH, and **JAMES LAWLER,**

Appellees.

_____

KENNETH FILLENWARTH d/b/a FILLENWARTH BEACH
and KENNETH FILLENWARTH,

Third-Party Plaintiffs,

vs.

CARI LAWLER, JOHN LAWLER, MATT LAWLER, MICHAEL LAWLER, and TERRY LAWLER,

Third-Party Defendants.

_____

Appeal from the Iowa District Court for Dickinson County, Don E. Courtney, Judge.

An injured person seeks damages based on dramshop liability against a resort that served alcoholic beverages. **REVERSED AND REMANDED.**

Erik A. Luthens of Luthens Law Offices, P.C., West Des Moines, for appellants.

Christopher L. Bruns (until withdrawal), Keith J. Larson, and Nicholas J. Kilburg of Elderkin & Pirnie, P.L.C., Cedar Rapids, and Michael J. Chozen of Chozen & Saunders, Spirit Lake, for appellees.

**CADY, Chief Justice.**

In this interlocutory appeal involving dramshop liability of a liquor license holder, we must primarily determine the meaning of the word "sold" within the Iowa Dramshop Law, Iowa Code section 123.92 (2011). The district court held that a beach resort that served alcoholic beverages without separate charge to resort guests during boat cruises provided as an advertised amenity of the hotel stay did not, as a matter of law, sell alcoholic beverages under the dramshop statute. It granted summary judgment to the resort licensee. On our review, we conclude the statute can encompass indirect sales under the facts alleged in this case. Accordingly, we reverse the district court and remand for further proceedings.

## I. Background Facts and Proceedings.

Fillenwarth Beach is a resort in Arnold's Park, Iowa, on Lake Okoboji. It is open every year during the summer season. Kenneth Fillenwarth owned the resort as a sole proprietorship until his death in 2014.[1] Fillenwarth Beach provides a number of amenities to its guests. The resort has indoor and outdoor pools, basketball and tennis courts, and a playground. It offers paddleboats and canoes for use on the lake, maintains a beach, and offers a variety of lessons to its guests. Other amenities included in a stay at Fillenwarth Beach for guests of the resort are complimentary cruises on Lake Okoboji in Fillenwarth-owned boats where free soft drinks, alcoholic beverages, and other beverages are served. The cruises are limited to resort guests. Kenneth, doing

---

[1]Kenneth Fillenwarth died April 24, 2014. The executors of his estate, Lynn and Julie Fillenwarth, were substituted as defendants for both Fillenwarth individually and Fillenwarth d/b/a Fillenwarth Beach.

business as Fillenwarth Beach,[2] holds two liquor licenses that authorize it to sell and serve alcoholic beverages. It offers wine and beer tastings and occasional social hours under a class "B" license and serves alcoholic beverages to guests on boat cruises around West Okoboji Lake under a class "D" license.

On July 31, 2011, Michael and Tonya Lawler checked into Fillenwarth Beach for a week stay, with their children Cari, James, and Kyle.[3] Michael assumed responsibility for the cost of the family stay at the resort. Vacations at Fillenwarth Beach with the extended family were a yearly event for the Lawlers. On the day the family arrived at the resort, several of them, including James, signed up for an adults-only lake cruise that served alcoholic beverages. While waiting for the cruise to start, James and other family members relaxed with alcoholic beverages they had brought to the resort.

Joseph and Suzanna Sanford were also guests at the resort on July 31, 2011. As with the Lawlers, the Sanfords and their family vacationed at Fillenwarth Beach each summer. The Sanfords had made friends among the yearly guests, and their sons enjoyed the resort activities. As with the Lawlers, the Sanfords signed up for the evening lake cruise on July 31, along with several friends who were staying at the resort, including Dr. Bill Weeks.

During the cruise, James consumed a number of alcoholic beverages. The bartender served James two mixed drinks, and he drank some beers from a self-serve keg near the bar. Towards the end of the

---

[2]The business was sued as Kenneth Fillenwarth d/b/a Fillenwarth Beach. We will refer to this party as Fillenwarth Beach to avoid confusion.

[3]Because we refer to both Michael and James Lawler throughout this opinion, we will call each by their first name.

cruise, while waiting for drinks near the bar on the boat, James and Michael exchanged heated words and threats with Dr. Weeks. Approximately half an hour after the end of the cruise, the Sanfords and their friends encountered some members of the Lawler family. The encounter soon escalated into physical violence when James assaulted Joseph Sanford.[4]

The Sanfords filed a lawsuit against Fillenwarth, Fillenwarth Beach (collectively Fillenwarth Beach), and James for damages resulting from the injury. The legal theories of recovery included dramshop liability against Fillenwarth Beach, loss of consortium based on the dramshop liability, assault and battery against James with related loss-of-consortium claims, and premises liability and related loss-of-consortium claims against Fillenwarth Beach.

Fillenwarth Beach moved for summary judgment on the dramshop-liability claims. It claimed the dramshop statute only applies to the sale and service of alcoholic beverages and does not apply to impose liability in this case because the alcoholic beverages were not sold but only served as an amenity of the resort. It also claimed no sale could have been made to James because he was not a paying guest. The district court granted summary judgment. It found no sale took place because James did not provide any consideration for the alcoholic beverages served to him. The Sanfords sought, and we granted, interlocutory review.

---

[4]James punched Joseph Sanford once in the head, which caused him to fall down and strike a low wall or curb, resulting in serious injury.

**II. Standard of Review.**

Summary judgment is appropriate only if there is no genuine issue of material fact entitling the moving party to judgment as a matter of law. *Thomas v. Gavin*, 838 N.W.2d 518, 521 (Iowa 2013). We consider the evidence in the record in the light most favorable to the nonmoving party. *Cox v. Rolling Acres Golf Course Corp.*, 532 N.W.2d 761, 763 (Iowa 1995). Review is limited to determining if a genuine issue of material fact is in question or if the law was correctly applied. *See Huck v. Wyeth, Inc.*, 850 N.W.2d 353, 362 (Iowa 2014).

"We review a district court's statutory interpretation for correction of errors at law." *Godfrey v. State*, 847 N.W.2d 578, 582 (Iowa 2014). When interpreting a statute, we look to the express language of the statute and, if it is ambiguous, to the legislative intent behind the statute. *Kay-Decker v. Iowa State Bd. of Tax Review*, 857 N.W.2d 216, 223 (Iowa 2014). When a word is not defined in the statute, we look to precedent, similar statutes, dictionaries, and common usage to define the term. *Id.*

**III. Analysis.**

The starting point of our analysis is the language of the statute governing dramshop liability. The relevant portion of the statute provides:

> Any person who is injured . . . by an intoxicated person . . . has a right of action for all damages actually sustained, severally or jointly, against any licensee or permittee . . . who sold and served any beer, wine, or intoxicating liquor to the intoxicated person when the licensee or permittee knew or should have known the person was intoxicated . . . .

Iowa Code § 123.92(1)(*a*) (2011).[5]

Essentially, the parties disagree over the meaning of the word "sold" in the statute. The Sanfords claim the statute is broad enough to include alcoholic beverages served by a resort as an amenity while Fillenwarth Beach claims the statute is restricted to those common transactions in which a direct exchange of money for the alcoholic beverage occurs. Thus, the Sanfords assert the statute applies to impose liability if the other elements are satisfied while Fillenwarth Beach asserts the statute does not apply to impose liability as a matter of law. Ultimately, the disagreement is resolved by interpreting the language of the statute.

In order to discover the meaning of a statute rendered ambiguous by a particular set of circumstances, it is often helpful to consider the proposition sought to be addressed by the legislature. *See IBP, Inc. v. Harker*, 633 N.W.2d 322, 325 (Iowa 2001). This is a key inquiry in this case because the language of the statute and the accompanying definitions provide little insight into the meaning of a sale.

The dramshop statute exists within the chapter of the Code identified as the "Iowa Alcoholic Beverage Control Act." Iowa Code § 123.1. It was enacted "for the protection of the welfare, health, peace, morals, and safety of the people of the state." *Id.* Its provisions are to be "liberally construed" to effectuate this purpose. *Id.* The Act is predicated on a policy that "traffic in alcoholic liquors" should be strictly regulated in the public interest. *Id.* Thus, many provisions of the Act prohibit the sale of alcoholic liquor, wine, or beer except under specific terms and

---

[5]The parties do not dispute the service requirement in this action or that the server knew or should have known James Lawler was intoxicated for purposes of this appeal.

conditions. *See, e.g., id.* § 123.2. Accordingly, the Act only defines the "sale" of alcoholic beverages in the context of a "prohibited '*sale.*'" *Id.* § 123.3(32). A prohibited "sale" under the Act "includes soliciting for sales, taking orders for sales, keeping or exposing for sale, delivery or other trafficking for a valuable consideration promised or obtained, and procuring or allowing procurement for any other person." *Id.* This definition does not fully illuminate the meaning of a "sale" in the context of the dramshop statute. Accordingly, we proceed to consider further the background of the statute to identify the problem sought to be addressed by the statute.

The dramshop statute was enacted to provide a remedy to innocent victims harmed by persons who are served excess liquor by licensees and permittees. *Hayward v. P.D.A., Inc.*, 573 N.W.2d 29, 34 (Iowa 1997). Its name refers to a place, or shop, where alcoholic beverages are sold by the dram, or the drink, to be drunk on the premises. *Malkan v. City of Chicago*, 75 N.E. 548, 551 (Ill. 1905); 48 C.J.S. *Intoxicating Liquors* § 36, at 203 (2014). The statute was a response to the absence of liability at common law for furnishing excessive amounts of alcoholic beverages to people who subsequently caused harm to others. *Haafke v. Mitchell*, 347 N.W.2d 381, 384 (Iowa 1984), *overruled in part on other grounds by Gail v. Clark*, 410 N.W.2d 662, 669–70 (Iowa 1987). At common law, the proximate-cause element of a tort claim was viewed to insulate a saloonkeeper from liability for injuries caused to others by patrons who drink to excess. *Id.* The dramshop statute obviated this problem by imposing liability. *Walton v. Stokes*, 270 N.W.2d 627, 628 (Iowa 1978). It was enacted to give protection to the public that the common law did not provide. *Wendelin v. Russell*, 259 Iowa 1152, 1158, 147 N.W.2d 188, 192 (1966), *overruled on other grounds by Lewis v. State*, 256 N.W.2d

181, 189, 192 (Iowa 1977). Iowa first enacted a form of dramshop liability in 1862. 1862 Iowa Acts ch. 47, § 2 (codified at Iowa Code § 1557 (1873)).

Prior to 1986, Iowa's dramshop statute broadly imposed liability on a licensee or permittee "who shall sell or give" alcoholic beverages to an intoxicated person. *See* Iowa Code § 123.92 (1985). In 1986, the legislature amended the statute to its present "sold and served" language. *See* 1986 Iowa Acts ch. 1211, § 12 (codified at Iowa Code § 123.92 (1987)). The primary purpose of the 1986 amendment was to restrict liability under the statute to situations when alcoholic beverages are served for consumption on the premises, and specific language was added to the statute to accomplish this purpose. *Kelly v. Sinclair Oil Corp.*, 476 N.W.2d 341, 347 (Iowa 1991), *abrogated on other grounds by Thompson v. Kaczinski*, 774 N.W.2d 829, 836, 839 (Iowa 2009). This change brought the statute more in line with the traditional concept of dramshop liability. However, by removing the word "give" from the phrase "sell or give," the amendment also expressed a legislative "intent to narrow the conduct for which a licensee may be liable." *Summerhays v. Clark*, 509 N.W.2d 748, 751 (Iowa 1993). It meant "purely gratuitous undertakings" by licensees and permittees no longer created liability under the statute. *Id.*

As a result, the legislature has drawn a line between a sale and a gift under the statute and has limited dramshop liability for licensees and permittees only when they sell and serve the alcoholic beverage to the intoxicated person who injured another person. *See id.* We have recognized the existence of this line and have sought to apply the statute so the line would not become blurred. *See id.*

In *Summerhays*, we held that intoxicating liquor served to employees at a restaurant and bar during a holiday party hosted by the employer licensee did not constitute a "sale" under the dramshop law. *Id.* We rejected the argument that consideration to support a "sale" could be derived from the employee's goodwill fostered by the party. *Id.* at 750–51. Instead, we applied a straightforward notion of consideration based on commonly understood distinctions to support a sale under the statute. *Id.* at 751. Similarly, we have implied that the sale of an alcoholic beverage normally involves a payment by the purchaser, although proof of payment is not always necessary to prove a sale. *See Smith v. Shagnasty's Inc.*, 688 N.W.2d 67, 73–74 (Iowa 2004); *see also* Iowa Code § 123.110 (2011) ("It shall not be necessary in every case to prove payment in order to prove a sale within the meaning and intent of this chapter.").

Clearly, we have taken a pragmatic approach to the meaning of the word "sale" in the dramshop statute. First, we look for the presence of consideration, which is a basic element of the traditional notion of a sale. *Summerhays*, 509 N.W.2d at 751. Second, we look to evidence of a payment, although it may be implied from the circumstances. *Smith*, 688 N.W.2d at 73–74. Finally, we have chosen not to adopt the theory that a sale under the statute can be established by the way a licensee or permittee may treat the service of alcoholic beverages for accounting and tax purposes or by the way the basic economic principle of "no free lunch"[6] may apply to the transaction. *Summerhays*, 509 N.W.2d at 753 (Lavorato, J., dissenting).

---

[6]The phrase "free lunch" refers to a past common practice in this country of saloons providing a "free" lunch to patrons who purchased a drink. *See* Chris Anderson, *Free: The Future of a Radical Price* 40–42 (2009) [hereinafter Anderson].

As a statute designed to impose liability on a licensee or permittee who serves alcoholic beverages, the problem sought to be addressed by the legislature stems from the conduct of the licensee or permittee. *See* Iowa Code § 123.92(1)(*a*); *see also id.* § 123.49(1)(*a*) (exempting those not required to hold a permit from civil liability). The problem sought to be addressed by the legislature was the conduct of selling and serving excess alcoholic beverages by licensees or permittees. Yet, the statute only imposes liability when the licensee or permittee is engaged in the expected or normal conduct of selling the beverages for which the license or permit is required. *See id.* § 123.92. The legislature did not want to impose liability on a licensee or permittee on those occasions when they give alcoholic beverages to others without tangibly benefiting from the action, as opposed to when they profit from selling the alcoholic beverages.

Even though the harm to a victim associated with serving excessive liquor can be the same whether the liquor is sold or provided gratuitously, there are reasons our legislature may not have wanted to impose dramshop liability when liquor is served gratuitously. First, the times when a licensee or permittee might choose to serve liquor to people without any return consideration or charge would be very limited. Additionally, the licensee and permittee is treated the same as other people who act as social hosts when dramshop liability is limited to sales. *See* Iowa Code §§ 123.49(1)(*a*), .92(1)(*a*). Furthermore, a licensee

---

Economist Milton Friedman also popularized the phrase by using it as the title of one of his books. Milton Friedman, *There's No Such Thing as a Free Lunch* (1975). The phrase has been used to describe an idea that is at the core of economics, that everything always has a cost. *See* Anderson, at 216–17. "Someone, somewhere, is paying for 'lunch' regardless of the posted price or absence thereof." David Adam Friedman, *Free Offers: A New Look*, 38 N.M. L. Rev. 49, 52 (2008).

or permittee does not engage in profit making by serving excessive liquor gratuitously. Thus, the legislature did not seek to address the more isolated or occasional problem of the gratuitous service of excessive liquor. Instead, the problem sought to be addressed was limited to licensees and permittees who use the license for its common and expected purpose of selling alcoholic beverages to others.

A sale can take place under a variety of circumstances in our advancing world of marketing. The term has both a common definition and a legal definition. We look to both in interpreting statutes. *See Schaefer v. Putnam*, 841 N.W.2d 68, 78 (Iowa 2013). *Webster's Dictionary* defines the word "sell" to include "to give up (property) to another for money or other valuable consideration" and "to deliver the personal services of for money." *Webster's Third New International Dictionary* 2061 (unabr. ed. 2002). *Black's Law Dictionary* defines "sell" as "[t]o transfer (property) by sale." *Black's Law Dictionary* 1567 (10th ed. 2014). It defines "sale" as "[t]he transfer of property or title for a price." *Id.* at 1537. *Black's* recognizes four elements of a sale: "(1) parties competent to contract, (2) mutual assent, (3) a thing capable of being transferred, and (4) a price in money paid or promised." *Id.*

The facts of each case ultimately reveal if a sale can be established. *See Smith*, 688 N.W.2d at 73–74 (noting "[c]ircumstantial evidence is equally probative as direct evidence"). Yet, we conclude that the intent of the legislature under the dramshop statute was to capture all direct and indirect sales supported by consideration tangibly benefiting the dramshop. This holding allows the statute to be applied to tackle the problem sought to be addressed by the legislature in enacting the statute and is consistent with our prior caselaw. It also gives greater definition

to the line between a sale and gratuitous service by a licensee or permittee.

In this case, the facts support an inference that boat cruises with alcoholic beverages were part of the consideration for the hotel stay. They were advertised to prospective guests as one of the amenities of the stay. Thus, this case is an example of the problem sought to be addressed by the legislature in imposing liability on licensees and permittees who sell and serve excessive liquor as part of their business. Fillenwarth Beach was serving alcoholic beverages to its guests on the boat cruises as part of its regular resort package, not as an isolated occasion as in *Summerhays*, in which there was no argument that any contract required the provision of beverages. *See* 509 N.W.2d at 749 (employee holiday party). The problem the legislature sought to address under the dramshop statute applied to the method in which Fillenwarth served alcoholic beverages on the boat cruises.

Additionally, the record in this case showed the resort services and amenities were only available to paying guests or guests who were intended third-party beneficiaries to the contract between the paying guests and the resort. Furthermore, Fillenwarth Beach does not provide the full amenities to all guests. The resort advertising literature provides that "not all amenities and activities are offered in the 50% discount rate periods." This implies alcoholic beverages were not gratuitous. If an amenity is only provided at a specific price point and above, the necessary implication is that the cost of that amenity is only covered at the higher price point and is therefore part of the higher price. We see no evidence that the rate paid by Michael was limited to only the room; rather, the advertisement of all the amenities strongly suggests the opposite. *See* Restatement (Second) of Contracts § 1 cmt. *c,* at 6 (1981)

("A contract may consist of a single promise by one person to another, or of mutual promises by two persons to one another; or there may be, indeed, any number of persons or any number of promises."). The Lawler family stayed at Fillenwarth Beach at the height of the season, not a discounted period as designated in the resort's advertisement, and so had a right to all of the amenities advertised. This is the type of evidence that supports a sale under the statute and that is sufficient to withstand summary judgment.

Fillenwarth Beach separately argues that a sale cannot be established with James as a matter of law because Michael was the person who rented and paid for the room. Yet, we have long recognized the existence and rights of third-party beneficiaries. *See Olney v. Hutt*, 251 Iowa 1379, 1384–86, 105 N.W.2d 515, 518–19 (1960) (discussing the circumstances under which a third-party beneficiary may recover under a contract). Indeed, more recently, we have adopted Restatement (Second) of Contracts on third-party beneficiaries:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
> > (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
> >
> > (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Restatement (Second) of Contracts § 302, at 439–40; *see also Midwest Dredging Co. v. McAninch Corp.*, 424 N.W.2d 216, 224 (Iowa 1988) (adopting the Second Restatement to recognize rights of third-party

beneficiaries). If the promisor has reason to know that the benefit to the third party is contemplated by the promisee, the third party has an enforceable right to that benefit. *RPC Liquidation v. Iowa Dep't of Transp.*, 717 N.W.2d 317, 320 (Iowa 2006) (noting the promisee's intent controls when it comes to third-party beneficiaries). If the third party has an enforceable right, then they are party to the sale, even if not to the contract governing the sale.

In this case, Michael was the promisee, expressly intending for the provision of a room and amenities for himself and his immediate family staying within his room. Fillenwarth Beach was the promisor and had reason to know that multiple persons were staying in the room with access to and use of all of the amenities of the resort in exchange for Michael's payment.[7] James had an enforceable right to the amenities of the resort as a third-party beneficiary to his father's contract with Fillenwarth Beach. The contracted goods and services included the lake cruise and the alcoholic beverages served on it.

We conclude the district court erred by granting summary judgment to Fillenwarth Beach in this case. Important to our decision is the goal for the statute to work in a way that addresses the problem the legislature sought to address. Additionally, the facts of the case are vastly different from those in *Summerhays*. First, the restaurant in *Summerhays* was closed to the public, permitting only employees and

---

[7]Fillenwarth argues this construction would necessarily result in sales to all the minor children who also stayed at the resort. However, minors would not have an enforceable right to performance due to the illegality of the conduct even if the paying party intended them to be served, so the minors could not be intended beneficiaries of the services providing alcohol under our law. *See Mlynarik v. Bergantzel*, 675 N.W.2d 584, 587 (Iowa 2004) (noting the law will not provide affirmative relief to either party in an illegal contract).

their guests to attend. 509 N.W.2d at 749. At the time the intoxicated person was served, the restaurant was not an establishment selling intoxicating beverages because no one served was exchanging or had earlier provided any consideration for the food and alcoholic beverages. *See id.* Fillenwarth Beach's cruise was not closed to all but employees and their guests, but rather was provided only to guests staying at the resort and was closed to those who did not provide consideration. Second, the *Summerhays* restaurant was under no obligation to host an employee holiday party or provide free food and drinks to the employees, nor did we find the party to be part of the employees' wages. *See id.* at 750–51. On the other hand, the cruise here was an advertised amenity of Fillenwarth Beach, and the resort was obliged to provide the cruise to its guests. Even though the cruise was not relied upon by either the Lawlers or the Sanfords when making the decision to stay at Fillenwarth Beach, the resort was still required to and did provide the amenity.

## IV. Conclusion.

We conclude the district court erred in interpreting the word "sold" in Iowa Code section 123.92(1)(*a*) to only apply to direct sales. We find third-party beneficiaries fall within the rubric of a sale for purposes of this statute and that the sale encompassed the entirety of the contracted goods and services. We reverse the district court and remand for proceedings consistent with this opinion.

**REVERSED AND REMANDED.**